. UNITED STATES of America

v.

10 CARTONS, More or Less, Each Containing 26,332 Black Tablets of an Article of Drug LABELED IN PART "HOXSEY"—100 S C Tablets Black Control Number 06980 * * * Testagar & Co., Inc., Detroit, Michigan * * * " and

4 DRUMS, More or Less, Each Containing 62,900 Red Tablets of an Article of Drug LABELED IN PART "From Testagar & Company, 1354 West Lafayette, Detroit, Michigan Name Special Tablets S C red 06949 LACTOTABS * * * " etc.

Civ. No. 13251.

United States District Court
W. D. Pennsylvania.
May 28, 1957.

D. Malcolm Anderson, Jr., U. S. Atty.,
Pittsburgh, Pa., William W. Goodrich,
Asst. Gen. Counsel, Dept. of Health, Education & Welfare, Washington, D. C., for
plaintiff.

Vincent M. Casey, Pittsburgh, Pa.,
James H. Martin, Dallas, Tex., for defendant.

JOHN L. MILLER, District Judge.

This is an action by the United States under the seizure and condemnation provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., for the destruction of a large quantity of red and black medicinal tablets and their labeling. It is alleged that the tablets were misbranded while held for sale at the premises of the Hoxsey Cancer Clinic at Portage, Pennsylvania, after having been shipped in interstate commerce. 21 U.S.C.A. § 334(a). Upon a libel of information filed by the government, a warrant of seizure and monition was issued from this court, and on March 25, 1955, the tablets and certain pamphlets, magazines, and leaflets alleged to be the labeling were seized at the clinic. An answer to the libel has been filed on behalf of the Hoxsey Cancer Clinic and Dr. Newton C. Allen as claimants. The cause was tried before the court and a jury and after lengthy contested proceedings resulted in a verdict in favor of the United States. The claimants have filed a motion for judgment in accordance with their motion for a directed verdict and in the alternative a motion for a new trial. In the interim, execution of the order of condemnation entered on November 16, 1956, has been deferred.

The Hoxsey Cancer Clinic is an institution at Portage, Pennsylvania, in the Western District of Pennsylvania, specializing in the treatment of cancer and cancerous diseases in humans by means of drugs and chemicals. It maintains a staff of physicians, nurses and administrative personnel. Persons from many parts of the nation suffering from cancer visit the clinic in hope of obtaining relief. These persons are not admitted as patients but visit the clinic for a day or a few days at most during the course of which interviews and examinations are conducted. The examinations include blood tests, X-rays, rectal or vaginal inspection and other accepted medical procedures which do not involve surgery. Biopsies are rarely if ever performed. If as a result of the interviews and examinations superficial or skin cancer is diagnosed an escharotic compound—not the subject of this action—is prescribed as the chief means of treatment. If internal cancer is diagnosed, a prescription for the red or black tablets, depending on the nature of the cancer, is written out by the physician in charge. Other supportive medications, such as vitamins, are usually prescribed. The tablets and medications are received by the patient at the drug counter of the clinic and are taken home with him for consumption according to given directions. The basic fee for the cancer treatment, including examinations and medications, is $400. In addition laboratory fees of from $5 to $18 and X-ray fees at $10 per picture are charged. If the patient acquires additional tablets no further charge is made except for laboratory or X-ray services. The tablets involved in this action, concededly "drugs" within the meaning of the Food and Drugs Act, were prepared by a Michigan pharmaceutical house at a cost of less than $2 a thousand and were transported in interstate commerce. The red tablets are composed of potassium iodide, red clover tops, stillingia root, berberis root, poke root, buckthorn bark and pepsin; the black tablets of potassium iodide, licorice, red clover tops, burdock root, stillingia, berberis root, poke root, cascara sagrada, prickley ash bark and buckthorn bark. The tablets are the essential part of the Hoxsey treatment for cancer and potassium iodide is considered by claimants the chief curative component.

The clinic began its operations in February, 1955, in an atmosphere of great local interest. When the seizure was effected on March 25, 1955, patients were being received for examination and treatment. The medications, the subject of this action, were then located in the drug and sterilization rooms at the rear of the clinic in their original containers from which they were eventually to be transferred to small envelopes for distribution to patients. Copies of the leaflets and printed matter described above

in the caption and seized with the tablets were found on a table in the foyer of the clinic which adjoined a waiting room used by patients and persons visiting the clinic. The bundled copies of the "Defender" magazine were seized in one of the rear rooms. The government, centering its attack only on Hoxsey medications used in the treatment of internal cancer, contends that the leaflets and printed matter caused the red and black tablets to be misbranded in three particulars: by making false or misleading representations with respect to the adequacy or effectiveness of the tablets in the mitigation and treatment of internal cancer; with respect to the terms of an existing court decree prohibiting entities not parties to this action from making such labeling claims for similar drugs distributed in interstate commerce; with respect to a survey allegedly discounting the effectiveness of X-rays, radium and surgery in treating cancer patients. The issues submitted to the jury were whether the printed matter and leaflets constituted "labeling" within the meaning of the Food and Drugs Act and if so, whether the labeling was false or misleading in any of those three particulars.

### The Motion for Judgment

■ Under § 304(a) of the Food and Drugs Act, 21 U.S.C.A. § 334(a), any article of drug that is misbranded while held for sale after shipment in interstate commerce is subject to federal seizure and condemnation procedures in accordance with the act. Under § 502, 21 U.S.C.A. § 352, a drug is misbranded if its labeling is false or misleading in any particular, and labeling is defined in § 201, 21 U.S.C.A. § 321, as meaning all labels and other written, printed or graphic matter upon the article or its container or "accompanying such article." In their first point in support of the motion for judgment, claimants present the contention that the leaflets and printed matter involved in this action were not labeling in the statutory sense.

In Kordel v. United States, 1948, 335 U.S. 345, 350, 69 S.Ct. 106, 109, 93 L. Ed. 52, the Supreme Court said:

> "One article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment one to the other is necessary. It is the textual relationship that is significant."

That case and United States v. Urbuteit, 1948, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61, establish that if the written, printed or graphic matter is used in the distribution or sale of a drug which has been shipped in commerce to explain the drug's use or usefulness, it may be considered labeling in a functional sense, even though there is a separation between the article and the printing. It is unnecessary to determine here how wide the separation may be before written, printed or graphic matter ceases to "accompany" the drug article. In the present instance, the literature was prominently displayed and available for reading by or distribution to patients or other persons at the very place where the Hoxsey medications were distributed. In addition, undisputed evidence demonstrated that the literature was sometimes mailed to patients. Under such circumstances, this court will not permit the yards of distance between the clinic's waiting room and the drug rooms or the intervening plaster walls to be the measurement of the application of the federal regulatory law. The pamphlet entitled, "Hoxsey Cancer Clinic" [1] states that its purpose is to acquaint the public with the clinic and its method of treating cancer "in terms the average layman can understand." It contains the statement "we do feel that we have the most advanced and efficient method of treating cancer today"—a method not including X-ray, surgery or radiation. It describes the procedure to be followed by prospective patients desiring consultations or treatment. The leaflet, "Procedure and

ı.  Government Exhibit 24.

Information"[2] lists the fees charged by the clinic for the cancer treatment and laboratory and X-ray services. The article from "Man's Magazine" entitled, "I Conquered Cancer"[3] details what appears to be a disinterested person's statement and report on the case histories of seven persons who were, the article indicated, treated successfully by the Hoxsey method after other treatment had failed. It includes a report on Mrs. Verne Kielbowick, sister of John Haluska, a former member of the Pennsylvania legislature and Administrator of the Portage Clinic. Mrs. Kielbowick attributed the recovery of her health to the Hoxsey remedy and is quoted as saying:

> "If anybody doubts that Hoxsey cures cancer, let him come to Patton and talk to the Haluskas."

The pamphlet, "Findings of Doctors"[4] contains the statement:

> "[O]ur investigation has demonstrated to our satisfaction that the Hoxsey Cancer Clinic at Dallas, Texas, is successfully treating pathologically proven cases of cancer, both internal and external, without use of surgery, radium, or X-ray."

The "Defender" magazine[5] includes a reproduction of a speech by former Senator Haluska to the Pennsylvania Senate in which he referred repeatedly to cures of cancer victims by the use of the Hoxsey treatment. It will be seen therefore that the materials consistently extolled the merits of the Hoxsey drugs in terms which the average layman would understand and which would be appealing to persons afflicted with the disease of cancer. Although modestly disclaiming that the drugs were a "cure-all" and putting the case for the tablets in terms of "you be the judge," the literature nevertheless explained what the drugs were for and implied that they were effective and superior medicines. The facts were clear and great liberality was shown in permitting the jury to pass upon the contention that the literature was not labeling.

In their second point, claimants argue that the drug articles in question were not "held for sale * * * after shipment in interstate commerce" within the meaning of § 304(a), supra. However, they concede that the red and black tablets were shipped in interstate commerce and were the "essential part" of the Hoxsey treatment for internal cancer in humans and that in the ordinary case a charge of $400 was made for a complete course of treatment exclusive of laboratory fees and X-ray charges. Upon those undisputed facts it would seem clear that the articles were held for sale. Claimants urge nevertheless that the drugs were intended, not for sale in the statutory sense, but for prescription by physicians in the pursuit of a local practice of medicine with which the act was not intended to deal and with which this court could not interfere. In this contention they are wrong.

The overriding purpose of the federal Food and Drugs Law was to protect the lives and health of the public by keeping misbranded, adulterated and impure foods and drugs out of the channels of interstate commerce. The coverage of the statute was enlarged by the Act of 1938 to every article that had gone through interstate commerce until it finally reached the ultimate consumer by making its prohibitions applicable to such articles "while * * * held for sale after shipment in interstate commerce." United States v. Sullivan, 1947, 332 U.S. 689, 697, 68 S.Ct. 331, 336, 92 L.Ed. 297. It may be that physicians are not understood as holding for sale the drugs which they may administer or prescribe in connection with their treatment of patients. But the potentiality of harm to the public from misbranded drugs is not less because the intervening agency of distribution may be a physician rather than a layman. The terms

---

2. Government Exhibit 41.

3. Government Exhibit 42.

4. Government Exhibit 43.

5. Government Exhibit 39.

"while held for sale" have been given an expansive rather than a technical construction, United States v. Kocmond, 7 Cir., 1952, 200 F.2d 370, certiorari denied 345 U.S. 924, 73 S.Ct. 782, 97 L. Ed. 1355; United States v. 1800.2625 Wine Gallons, D.C.W.D.Mo.1954, 121 F. Supp. 735, and must be deemed to include the operations of the claimants in distributing their drug tablets at the Hoxsey Cancer Clinic. It is not the holding for sale in a technical legal sense which gives rise to the federal jurisdiction in cases arising under § 304(a) but the fact that the channels of commerce have been used. United States v. 1800.-2625 Wine Gallons, supra. Since interstate transportation has been admitted, the ban of the section applies to the tablets here involved regardless of the claims of the Hoxsey Cancer Clinic and Dr. Newton C. Allen, its medical director. If forfeiture works any interference with claimants' practice of medicine it is a mere incident of their violation of the law in making representations concerning their drugs which the jury found were unwarranted, false or misleading.[6]

■ The only other point which is urged in support of the motion for judgment may be dismissed without much discussion. Claimants say that the proper standard to be applied in determining whether there was a misbranding of the Hoxsey tablets while they were "held for sale" is to be found in subsection (k) of § 301 of the act, 21 U.S.C.A. § 331(k), which prohibits:

"The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

Claimants construe that language very narrowly and say that the government failed to sustain its burden of proof because it did not show that anything affirmative was done to the drugs themselves, which remained undisturbed in their original containers. Section 301 sets forth "Prohibited Acts" and § 303, 21 U.S.C.A. § 333 makes violation of the provisions of § 301 a criminal offense. Section 301 had no real application in this civil proceeding for condemnation of misbranded drugs under § 304(a). In any event, the bringing into association of the alleged labeling and the drugs was a sufficient act "with respect to" the drugs which in this case rendered them misbranded.

The Motion for a New Trial

Although more than twenty overlapping reasons have been assigned in the motion for a new trial, all except those set forth under points 4, 6, 8, 15 and 17 were expressly abandoned by counsel for claimants on argument. Points 4 and 6 deal with asserted errors in the admission of evidence; the remaining points present alleged errors in the charge to the jury. The objections to the evidence are dealt with first.

■ *The testimony of Shanley and Gulledge, federal food and drug agents.* Shanley at the Portage Clinic and Gulledge at the Dallas Clinic, posing as cancer patients, were examined in the customary manner, told they had cancer and given a supply of the Hoxsey medication to take home and consume. Neither had cancer. The testimony was offered to show the similarity of procedures at the two clinics and the inadequacy of the procedures. The evidence, with other evidence in the case, was relevant as bearing on the relationship between the two clinics and on the question whether there was privity between the Portage Clinic and the Dallas Clinic and Harry M. Hoxsey, against whom and the Dallas Clinic a prior injunctive decree had been entered. When the application of the

6. When Congress intended to exempt licensed practitioners from the operation of the Act, it spoke plainly enough. See § 503(b) (2), 21 U.S.C.A. § 353(b) (2).

doctrine of collateral estoppel was exclusively reserved to the court at the end of the case by withdrawing the question of privity from the jury, the testimony of Shanley and Gulledge, say the claimants, stuck out like a sore thumb. In a case of long duration involving contested issues of legal and factual complexity, it was impossible to foresee the exact boundaries of the case to be submitted. The members of the jury were told they were not to concern themselves with the question of privity; they were told that the question of misbranding did not depend on the intention or motives of those distributing the drugs and that the diagnostic abilities of the staff of the clinic were not in question. Under the circumstances, this was sufficient.

■ *The evidence revealing the deaths of Crescens Klemmer, James Barger and Nicolei Lupanov.* These persons were cancer victims who were treated according to the Hoxsey method. The account of their medical history, illness and death by relatives and physicians was pertinent in showing whether they had been thus effectively treated for their disease. It was not suggested to the jury that their deaths were conclusive on the question. Similar testimony was admitted in United States v. Kaadt, 7 Cir., 1948, 171 F. 2d 600, 603, a case involving a claimed cure for diabetes.

■ *The cross-examination of Doctor West.* On direct examination, West (employed as director of research at the Hoxsey institution in Dallas, Texas) supported the claim of merit for potassium iodide, the principal ingredient of the Hoxsey medicines, which, according to his statement, had produced good results in a large number of cases by a process of strangulation or asphyxiation of abnormal tissue. The testimony of the government's expert medical witnesses and researchers had indicated that potassium iodide was either of no effect or harmful in the treatment of cancer. Without first interrogating West as to a past criminal record, government counsel

placed in evidence a certified copy of a complaint and record [7] revealing that on May 14, 1953, the witness pleaded guilty to a charge of practicing medicine without a license in the City of Los Angeles. This procedure did not amount to a reversible error. 3 Wigmore on Evidence (3rd Ed.) § 980. In addition it was shown through official records of the State of New York [8] that West had been denied permission in 1951 to practice medicine in New York because of insufficient training. Both matters affected the qualifications of the witness, which were directly in issue, and were properly received.

In their motion for a new trial, claimants renew their argument relating to the holding for sale of the tablets in question, this time contending that whether the tablets were held for sale within the meaning of the statute should have been determined by the jury and not by the court as a matter of law. The court has adverted to and discussed the "held for sale" requirement of § 304(a) extensively and has pointed out that there was no substantial dispute as to the important factors for determining whether there was a statutory holding for sale: a substantial charge was made for the course of treatment by the Hoxsey method and the treatment included prescription of the tablets as its essential part. The tablets at the time of the seizure had not yet reached the hands of the ultimate consumers and were therefore held for sale. United States v. Kocmond, supra, 200 F.2d at page 373. Nothing remained for the jury.

■ Claimants take the view that the court erred in telling the jury to consider in determining whether the Hoxsey medications were misbranded the impression which the various articles of literature would have upon the minds of victims of internal cancer who came to the clinic as patients. Although exception was taken to this point in the charge, claimants did not either before or afterwards suggest to the court what other

---

**7.** Government Exhibit 210.

**8.** Government Exhibit 209.

standard they thought proper. However, the given instruction was appropriate. Claimants designedly or at least willingly made the labeling available for the use of unfortunate persons who were afflicted with cancer or who thought they were and who had come to the clinic for help. The literature would naturally appeal to those persons as it was undoubtedly intended to. They were the persons upon whom it would have its greatest effect because they were likely to be less critical, and less apt to question the representations by laymen and others reported in the leaflets. It is therefore only fitting that the truth or falsity of the literature or its misleading nature be measured by its significance to them and not to persons who for one reason or another would be likely to form a more critical judgment. In this conclusion, the court is supported by plentiful authority. United States v. Vitamin Industries, Inc., D.C.Neb.1955, 130 F.Supp. 755, 767; United States v. 23 More or Less Articles, 2 Cir., 1951, 192 F.2d 308, 310; United States v. Kaadt, supra, 171 F.2d at page 603; United States v. Hoxsey Cancer Clinic, 5 Cir., 1952, 198 F.2d 273, 276, certiorari denied 344 U.S. 928, 73 S.Ct. 496, 97 L.Ed. 714, rehearing denied 345 U.S. 914, 73 S.Ct. 642, 97 L.Ed. 1348.

■ The next argument is that it was a reversible error to tell the jury that the question whether one suffering from internal cancer has received adequate and effective treatment was "essentially a medical question." A new trial will not be awarded for this reason. Claimants argue that the statement required the jury to give more credence to the doctors who testified than to the patients themselves who were called by claimants to testify as to their physical conditions before and after receiving the Hoxsey treatment. Assuming this would have been improper, claimants' assignment is merely an instance of the long discountenanced practice of leveling attacks at an isolated portion of the charge without regard to what was said before and after. The issues to be decided were made clear to a jury which after many weeks of trial was well aware of the contentions and proofs of both parties and equipped with more knowledge about the disease of cancer than most laymen would ever acquire. They were told to evaluate claimants' evidence in light of all the testimony, including that of the doctors offered on both sides. There is no just cause for complaint.

■ There remains to be considered only the assignments raising the propriety of the submission to the jury of certain statements in the printed matter as separate instances of misbranding. The first of these [9] set forth a summary of a report by Dr. George Hiley, described as medical director of the Gotham Hospital, New York, and having impressive qualifications, to a Congressional Committee relating to a survey of cancer patients in Pennsylvania allegedly conducted by Dr. Stanley Reimann. The substance of the report, as summarized, was that Reimann's survey "over a long period of time" had established that cancer patients fared better if they did not receive treatment by radium, X-ray or ordinary surgery. All of this, including the making of such a survey, was denied by Dr. Reimann who was called as a witness for the government and who also testified that he had notified the committee that Miley's report was inaccurate. The literature did not note his protest. See 21 U.S.C.A. § 321(n). Claimants urge that no instance of misbranding was shown because the report had in fact been made as set forth in the literature. However, at least by indirection the printed matter created an impression that it was a fact that such a survey had been made and that the survey justified the conclusions asserted. It would naturally tend to have greater effect upon a susceptible reader not only because the author of the report was a member of the medical profession but also because of the dignity of the forum to which the report was addressed. On the evidence the jury could have found that the facts implied in

**9.** Government Exhibit 24, p. 8.

claimants' literature were untrue. It is not possible for claimants to escape responsibility for those implications now. Drawn as they were, the statements made a more persuasive appeal to cancer sufferers than if the representations implied had been made directly by claimants alone and for that reason, it has been said, they are not less but more obnoxious to the law. United States v. John J. Fulton Co., 9 Cir., 1929, 33 F.2d 506; cf. United States v. Dr. David Roberts Veterinary Co., Inc., 7 Cir., 1939, 104 F.2d 785, 789; cf. Moretrench Corporation v. Federal Trade Commission, 2 Cir., 1942, 127 F.2d 792, 795. In submitting the issue to the jury, the court merely followed the explicit canon of construction of the act which the Supreme Court long ago set forth in United States v. 95 Barrels More or Less, Alleged Apple Cider Vinegar, 265 U.S. 438, 442, 44 S.Ct. 529, 531, 68 L.Ed. 1094:

> "The statute is plain and direct. Its comprehensive terms condemn every statement, design and device which may mislead or deceive. Deception may result from the use of statements not technically false or which may be literally true. The aim of the statute is to prevent that resulting from indirection and ambiguity, as well as from statements which are false. It is not difficult to choose statements, designs and devices which will not deceive. Those which are ambiguous and liable to mislead should be read favorably to the accomplishment of the purpose of the act * * *."

■ The second challenged statement is found in the printed matter [10] under the heading "Court Rulings." In the text appears a discussion of proceedings instituted by the United States against the Hoxsey Cancer Clinic of Dallas, Texas, and Harry M. Hoxsey in the District Court for the Northern District of Texas. Then follows the statement that the District Court in obe-

dience to the mandate of the Court of Appeals (5 Cir., 198 F.2d 273), on June 29, 1953, entered a decree of injunction restraining the distribution in interstate commerce of the Hoxsey medications containing labeling representing that the substances were effective or of value in the treatment of cancer *"without appropriate qualifying statements revealing the conflict of medical opinion as to the truth of such representations."* What the printed matter failed to mention was that in mandamus proceedings instituted against the District Judge, the Court of Appeals determined that its mandate had not been obeyed and required the lower court to expunge from its decree the qualifying phrase quoted above. 5 Cir., 207 F.2d 567. This was done on October 26, 1953.[11] Claimants do not deny the false or misleading character of the representations made in the literature but simply suggest that the omissions were not material. This contention boils down to an argument that the misrepresentations could not possibly be "labeling"—i.e., printed matter accompanying the drug in the sense of explaining its use or usefulness. Kordel v. United States, supra. The Court of Appeals for the Fifth Circuit after carefully weighing the evidence in the case had actually concluded as a fact that the drugs, substantially identical to those involved here, were of no value in the treatment of cancer, but the literature created the impression that the Court had taken an indecisive stand. It is the view of this court that the considered judgment of such a tribunal of the United States with respect to the merits of the very substances in question would necessarily be of significance to any person interested enough to read about the Hoxsey remedy and particularly to those who were confronted with the choice of accepting or declining the Hoxsey treatment. By implying that a court of the United States had sanctioned the making of claims of effectiveness for the drugs, the literature gave the impression that the Hoxsey remedy in fact had merit and in this sense directly explained its

10. Government Exhibit 24, pp. 5–8.

11. Government Exhibit 121.

usefulness. At most, the question is one upon which reasonable persons could differ.

The vital issue in this case was the efficacy of the Hoxsey treatment for internal cancer in humans. No claim is made that the question of the adequacy and effectiveness of the tablets was improperly submitted to the jury. Claimants were given the fullest opportunity to state their case for the drugs but their evidence was rejected by the jury. The court is not called upon in this opinion to discuss the sufficiency of the government's expert and lay testimony showing that the drugs were without merit in the treatment of cancer and observes only that the verdict of the jury is supported by persuasive and overwhelming evidence. The Hoxsey medications have again been weighed and found wanting.

The motions for judgment and a new trial will be denied.