William **LABZDA** and Carol Jo Labzda, individually, as Parents and Personal Representatives of the Estate of Michael Labzda, and in the Name of the State of Florida, Plaintiffs,

v.

**PURDUE PHARMA L.P., Purdue Pharma, Inc., the Purdue Frederick Company, et al. Defendants.**

### No. 018726CIV.

United States District Court, S.D. Florida.

Sept. 23, 2003.

William Bennett King, John Scarola, Searcy Denney Scarola Barnhart & Shipley, West Palm Beach, FL, for Plaintiffs.

Sidney Alton Stubbs, Jr., Steven Jeffrey Rothman, Jones Foster Johnston & Stubbs, Patricia Elaine Lowry, Dori Katrine Stibolt, Steel Hector & Davis, West Palm Beach, FL, Mary T. Yelenick, Matthew Kliegman, Donald I. Strauber, Peter K. Eck, Chadbourne & Parke, New York City, Gordon A. Smith, King & Spalding, Atlanta, GA, David Spyros Tadros, Walton Lantaff Schroeder & Carson, West Palm Beach, FL, for Defendants.

## FINAL JUDGMENT

MARRA, District Judge.

THIS CAUSE is before the Court upon the Defendants, Purdue Pharma L.P., Purdue Pharma, Inc., and the Purdue Frederick Company's Motion for Summary Judgment [DE 106], the Report and Recommendation [DE 187] of Magistrate Judge Lurana S. Snow, filed September 8, 2003, and the Joint Stipulation for Entry of Final Judgment [filed September 19, 2003]. The Court has carefully considered the record, and is otherwise fully advised in the premises.

As described in the Report and Recommendation, the only parties remaining in this case are the Plaintiffs and the Purdue Defendants. The Report of Judge Snow recommended that the Defendants' Motion for Summary Judgment be granted. Pursuant to the Court's review of the Report and Recommendation and the parties' stipulation, the Court adopts the Report and Recommendation.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Magistrate Judge's Report and Recommendation [DE 187] is hereby **ADOPTED;**

2. Defendants, Purdue Pharma L.P., Purdue Pharma, Inc., and the Purdue Frederick Company's Motion for Sum-

mary Judgment [DE 106] is hereby **GRANTED**;

3. This action against Defendants Purdue Pharma L.P., Purdue Pharma, Inc., and the Purdue Frederick Company is hereby **DISMISSED WITH PREJUDICE**;

4. Judgment is hereby entered on behalf of Defendants Purdue Pharma L.P., Purdue Pharma, Inc., and the Purdue Frederick Company, and against the Plaintiffs, William Labzda and Carol Jo Labzda and Plaintiffs shall take nothing from Defendants in this action;

5. Each party shall bear their own fees and costs;

6. The Order sealing the Report and Recommendation [DE 189] is hereby **VACATED**;

7. Any other pending motions are denied as moot;

8. The Clerk may close this case.

### REPORT AND RECOMMENDATION

SNOW, United States District Judge.

THIS CAUSE is before the Court on the Defendant Purdue's Motion for Summary Judgment (Docket Entry 106), which was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

### I. PROCEDURAL HISTORY

The complaint was filed in July 2001 in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, alleging violation of Florida's Deceptive and Unfair Trade Practices Act, negligence and public nuisance related to the accidental death of Michael Labzda related to his misuse of the drug OxyContin. The complaint named as defendants Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Abbott Laboratories, Abbott Laboratories, Inc., Walgreen Co. d/b/a Walgreens Family Physician P.A. and Denis Deonarine, M.D.

The defendants removed the case to federal court based on diversity of jurisdiction (Walgreen filed a consent to the removal) and federal question jurisdiction related to the federal regulatory scheme for prescription drugs. All of the defendants filed answers, except Walgreen, which filed a motion to dismiss for failure to state a claim (Docket Entry 9). On October 31, 2001, the Court adopted the stipulation of the parties and dismissed the claim against Dr. Deonarine. On November 26, the Court entered the stipulated dismissal of Walgreen's Family Physician P.A.

Thereafter, Purdue Pharma L.P. filed a motion for a judgment on the pleadings (DE 43) and the plaintiff filed a motion to dismiss Count I as to all defendants (DE 50). Abbott Laboratories filed a motion for summary judgment (DE 66), which was granted by default (DE 78). The Court adopted the stipulation of dismissal of the Walgreen Company (DE 87) and the stipulation of dismissal for Abbott Laboratories and Abbott Laboratories, Inc. (DE 100).

On December 2, 2002, the plaintiffs sought leave to file an amended complaint, which the Court granted (DE 117). The amended complaint, with a single count of wrongful death, named as defendants Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company. The plaintiffs alleged that their adult son, Michael Labzda, died as a result of misusing OxyContin prescribed by Dr. Denis Deonarine. The amended complaint alleged that the Purdue defendants knew

that Dr. Deonarine, without sufficient examination, over-prescribed OxyContin to patients; but the defendants did not attempt to curtail the inappropriate prescriptions, ignoring the potential for abuse of their product. The plaintiffs contend that this constituted a breach of the duty of care in the marketing and distribution of the product.

Mediation in February 2002 resulted in an impasse (DE 105). The Purdue defendants subsequently filed the instant motion for summary judgment, which is fully briefed and is ripe for consideration.

## II. MATERIAL FACTS NOT AT ISSUE

The defendants provided a detailed list of material facts regarding the product and its approved use, how it was prescribed for Michael Labzda and the manner in which he used the product on the night before his death. The plaintiffs submitted a responsive statement of material facts, none of which contradict the material facts in the defendants' statement, but instead focus on the actions of the physician who issued the prescriptions to Michael Labzda, and the marketing efforts the defendants directed toward that physician. The defendants' reply, noting that the plaintiffs did not dispute any of the facts proffered by the defendants, asserts that they are entitled to a judgment as a matter of law.

The defendants' statement reveals that in December 1995, the Food and Drug Administration approved Purdue's sale of OxyContin, a controlled-release form of oxycodone. (DE 109, Exhibit 5 ¶ 3) While oxycodone has been approved for prescription use for more than 60 years, Purdue's product was unique in its controlled-release design. (*Id.* at ¶ 5) OxyContin is available by prescription only. (*Id.* at ¶ 4)

Michael Labzda obtained a prescription for OxyContin from Dr. Denis Deonarine on July 17, 2000. (DE 109, Exhibit 15, medical records of Dr. Deonarine, MED 00053–54 and 00061–62) Michael Labzda filled out a New Patient Information for stating that he had a history of back pain. (*Id.* at MED 00054) He told Dr. Deonarine that he suffered lower back pain from a tractor accident. (*Id.* at MED 00061). Dr. Deonarine diagnosed chronic back pain and anxiety and/or panic attacks and issued a thirty-day prescription for OxyContin, Oxy IR 5 and Xanax. (*Id.* at MED 00061–62) Michael Labzda returned to Dr. Deonarine on August 17, 2000, and November 7, 2000, each time receiving a 30–day prescription of OxyContin and Xanax. (*Id.* at MED 00063–75). On February 6, 2001, Michael Labzda again visited Dr. Deonarine and was required to fill out and sign a Pain Management Agreement in which he agreed not to use illegal controlled substances; not to share, trade or sell his medication; not to attempt to obtain controlled substances from any other doctor, and not to use the medication at a rate greater than the prescribed rate. (*Id.* at MED 00072–73).

The package insert for Oxycontin states that the **"TABLETS ARE TO BE SWALLOWED WHOLE, AND ARE NOT TO BE BROKEN, CHEWED OR CRUSHED. TAKING BROKEN CHEWED OR CRUSHED OxyContin TABLETS COULD LEAD TO THE RAPID RELEASE AND ABSORPTION OF A POTENTIALLY TOXIC DOSE OF OXYCODONE."** (DE 109, Exhibit 1) The insert repeats this information several times and discusses the potential for abuse of OxyContin and the symptoms of over-

use. The label on Michael Labzda's prescription bottle of OxyContin stated "Swallow whole, do not chew or crush. May cause drowsiness. Alcohol may intensify this effect." (DE 109, Exhibit 20) Walgreen's packaging of his prescription stated "SWALLOW WHOLE. Do not break, crush or chew before swallowing.... Do not take two doses at once.... DO NOT TAKE MORE OF THIS MEDICINE or take it more often than recommended by your doctor.... AVOID ALCOHOL while you are using this medicine." (DE 109, Exhibit 18).

The defendants' representative to Dr. Deonarine was Ms. Kimberlee Workman. She did not provide any OxyContin to Dr. Deonarine, or sell OxyContin to him. (DE 109, Exhibit 22, Workman Deposition, pp. 9, 51–57) Her job was to provide Dr. Deonarine with information about OxyContin to as it related to his patients. (*Id.*) While she discussed various medical records with Dr. Deonarine, he rarely divulged the names of his patients, so she did not know if she had discussed Michael Labzda' case. (*Id.,* at pp. 192)

Michael Labzda began using and selling illicit drugs while in high school. (DE 109, Exhibit 3, deposition of Christopher Spears, pp. 60–61, 64–66 and 75–77; Exhibit 9, deposition of Daniel Boulter, p. 3) He had three drug arrests in the year before his death, including a arrest on November 24, 2000, for felony possession of marijuana. (DE 109, Exhibits 10–12, arrest records) Prior to his first prescription from Dr. Deonarine, Michael Labzda had used OxyContin, marijuana, Ecstasy, Xanax and alcohol. (Spears depo. at pp. 23–25, 31–32, 35–37, 50, 53 and 64–66; Boulter depo. at p. 30) Also prior to that prescription, he purchased, sold and used OxyContin "off the street." (Spears depo. at pp. 48–51, 43, 59–63 and 83) He continued to buy, sell and use "street" OxyContin after obtaining his prescriptions. (Spears depo. at pp. 74 and 82–84)

Michael Labzda took illicit and prescription drugs, not to relieve pain, but to get high. (Spears depo. at p. 90) He lied to Dr. Deonarine about his medical condition to obtain the prescriptions. (Spears depo. at pp. 39–41, 51 and 85) He had not been involved in a tractor accident and did not suffer chronic back pain. (DE 109, Exhibit 13, deposition of Carol Labzda, pp. 171–85; Exhibit 14, deposition of William Labzda, pp. 42–43, 52–53, 127–128; Spears depo. at pp. 39–41, 44, 46–47, 51, 70 and 85) He sold most of the prescribed drugs for money, and used the small remainder. (Spears depo. at p. 82).

On the evening of February 7, 2001, Michael Labzda and Christopher Spears visited with friends and used marijuana and alcohol at various locations. They ended up at the home of another friend. Between 6:00 p.m. on February 7 and 5:00 a.m. on February 8, Michael drank approximately 14 beers (eight of them after 1:00 a.m.), shared approximately five marijuana cigarettes, drank a shot of rum, drank at least two rum and Cokes and took approximately three tablets of the strongest strength of Xanax. (Spears depo. at pp. 102–05, 107–08, 110–115, 117–124, 127 and 130–47) Additionally he crushed and snorted one and a half to two 80 milligram tablets of OxyContin. (Spears depo. at pp. 133–34, 135, 142–47) When Christopher Spears awoke on February 8, Michael Labzda was not moving; paramedics were unable to revive him. (Spears depo. at pp. 148–155) The medical examiner listed the cause of death as "polydrug toxicity." (DE 109, Exhibit 4).

The State of Florida filed an 80–count indictment against Dr. Deonarine, includ-

ing charges for trafficking in oxycodone and for the first degree murder of Michael Labzda while trafficking in oxycodone. (DE 109, Exhibit 23). Accordingly, Dr. Deonarine invoked his Fifth Amendment right against self-incrimination at his deposition in the instant case.

The plaintiffs' statement of facts reveals that Kimberlee Workman, as a sales representative of Perdue, called on Dr. Deonarine from 1991 until his arrest in 2001. (DE 129, Exhibit 19, Workman depo. at Exhibit 14) While she did not sell or provide OxyContin to physicians, her bonus depended on the amount of Oxycontin sold in her territory. (Workman dep. at pp. 14–15) Dr. Deonarine was a high prescriber, called a "whale," in her territory. (*Id.* at pp. 261–62).

When she visited Dr. Deonarine, his employees repeatedly expressed concerns to her regarding Dr. Deonarine's procedure for prescribing OxyContin. They stated that he did not perform proper physical examinations or pain assessments. (DE 129, Exhibit 11, deposition of Carrie Kolodziejcak, p 57; Exhibit 10, deposition of Barbara Groseclose, p 126) He did not perform range of motion tests, flexibility tests or other tests to confirm the existence and extent of pain. (Kolodziejcak depo. at pp. 36–37 and 45; Groseclose depo. at pp. 33–34) There was no documentation to support the patients' claims of pain or injury. (Kolodziejcak depo. at pp. 27–28, 37 and 45; Groseclose depo. at pp. 28–30) If documentation was received, Dr. Deonarine did not look at it. (DE 129, Exhibit 14, deposition of Careen McCray, pp. 6–7; Exhibit 20, deposition of Melissa Yeager, pp. 7 and 33)

Dr. Deonarine required that patients, including Medicaid patients, pay for each office call in cash before he would provide a prescription. (Kolodziejcak depo. at pp. 33–36, Groseclose depo. at p. 25, McCray depo. at pp. 11–12) He would see up to 48 patients per day from all over South Florida, many waiting three to five hours to obtain prescriptions. (Kolodziejcak depo. at pp. 26, 31; Groseclose depo. at pp. 47–49, 59–59; McCray depo. at pp. 19–20) When employees expressed concerns to Dr. Deonarine that patients were becoming addicted to OxyContin, they were told it was not their business, or that they were wrong. (Kolodziejcak depo. at p. 52; McCray depo. at pp. 14–16; Groseclose depo. at pp. 50–51) Dr. Deonarine employed former patients and continued to prescribe Oxycontin for them. (Kolodziejcak depo. at pp. 22–23; McCray depo. at pp. 4–5, 15, 17; Yeager depo. at p. 57) Indeed Dr. Deonarine was taking Oxycontin himself during work, causing him to fall asleep, slur words, or fail to come to work at all. (Kolodziejcak depo. at pp. 9–15, 17–20, 60–62 and 68; McCray depo. at p. 7; Groseclose depo. at pp. 63–64, 66–67, 98 and 127) He sometimes obtained these drugs by having the employee-patients fill prescriptions in their own names for him. (Kolodziejcak depo. at p. 21; McCray depo. at p. 17; Groseclose depo. at pp. 64–66, 112–113) Employees repeatedly discussed all of these concerns with Kimberlee Workman. (Kolodziejcak depo. at pp. 60–62, 73–75 and 79; Groseclose depo. at pp. 42, 67–68, 70–73)

Pharmacists contacted Ms. Workman to express concerns about the number of OxyContin prescriptions written by Dr. Deonarine (DE 129, Exhibit 12, deposition of James Longo, pp 14–15, 17–18, 24, 26–28 and 30; Exhibit 7, deposition of Jason Appel, pp. 11–12, 41–42; Exhibit 21, deposition of Kenneth Zielinski, pp. 10–14, 26–27; Exhibit 16, deposition of Arthur Seltzer, pp. 10–13, 30); the large number of

combination prescriptions (Longo depo. at pp. 24, 27–28, 30; Appel depo. at pp. 11–12, 41–42, Zielinski depo. at pp. 11–12); prescriptions issued without any apparent therapeutic plan (Longo depo. at 53); the high dosages prescribed (DE 129, Exhibit 13, deposition of Robert Loranger, pp. 49–51; Zielinski depo. at p. 29), and the large geographical area for the patients seen (Longo depo. at pp 36–37; Zielinski depo. at pp 24–25; Seltzer depo. at p. 31) Ms. Workman responded that she would address these concerns and that Purdue continued to monitor Dr. Deonarine's activities. (Loranger depo. at pp. 32–35; Appel depo. at pp. 32–35; Zielinski depo. at pp. 45–50, 55–60; Seltzer depo. at pp. 58–61, 63–674, 68–70)

Ms. Workman spoke to her supervisors, Rich Denyer and Chris Sposato, about Dr. Deonarine's failure to use pain assessment kits provided by Purdue, (Workman depo. at pp. 104–107); the abuse of Oxycontin by his patients (*Id.* at 109–111); the pharmacists' concerns about the multiple opiod prescriptions, which pharmacists occasionally refused to fill, and concerns about the office staff (*Id.* tat 127–29) She hoped the supervisors would allow her to stop calling on Dr. Deonarine, and remove him from her territory for the purpose of setting her quota. (*Id.* at 381–82) Mr. Sposato told her it was not her job to police Dr. Deonarine and that she should continue to do her job. (*Id.* at 384–85)

As part of her job, Ms. Workman was supposed to review patient files and make recommendations regarding the prescribing of Oxycontin, to enhance the use of OxyContin. (DE 129, Exhibit 17, Sposato deposition, at pp. 125, 128, 133, 135–37, 141, 144, 147–54) When she reviewed the files, the patients names were not shown to her. (Kolodziejzcak depo. at pp. 63–64, 73,

76–77, 80). A physician who reviewed Dr. Deonarine's medical records for Michael Labzda opined that he had prescribed inappropriate amounts of OxyContin instead of trying less potent drugs. (DE 129, Exhibit 5)

The plaintiffs' expert, Mr. John Mudri, a former DEA administrator concluded that Purdue acted in a manner inconsistent with the standards set forth in 21 U.S.C. § 823, which requires manufacturers of controlled substances to act in accord with the public interest by failing to prevent the diversion of OxyContin by Dr. Deonarine. (DE 129, Exhibit 2, affidavit of John Mudri; Exhibit 15, deposition of John Mudri, pp. 160–252) Mr. Mudri opined that Purdue should have ceased marketing to Dr. Deonarine and should have reported him to law enforcement and other agencies. (*Id.*) After Dr. Deonarine's arrest, the Florida Board of Medicine suspended his license to practice medicine, finding that he was "an immediate and serious threat to the health, safety and welfare of the public." (DE 129, Exhibit 4)

In 2002, the defendants adopted an Eleven Point Program which required sales representative to report to the defendant's general counsel any physician suspected of prescribing OxyContin outside the bounds of a legitimate medical practice, and to stop calling on such a physician. (Sposato depo. at pp. 164–73, 264–65, 303–304). However, the program does not require the notification of law enforcement. (Sposato depo. at pp. 332–334)

## III. RECOMMENDATIONS OF LAW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence must be viewed in the light most favorable to the non-moving party. *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

In opposition to a motion for summary judgment, a party must produce more than a scintilla of evidence on his behalf; he must produce sufficient evidence upon which a reasonable jury could find for him. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

The defendants assert that the plaintiffs cannot demonstrate negligence on the part of the defendants because there is no evidence that the product was defective; no evidence that the defendants failed to provide adequate warning of the risk of misusing the product; no evidence of any design defect in the product, and no evidence of any manufacturing defect in the product. The plaintiffs do not contest any of these assertions, and the Court will not address them further.

The defendants also contend that there is no evidence that they violated any duty under Florida law or the Controlled Substances Act, 21 U.S.C. § 823. They assert that Michael Labzda's misuse of the product bars recovery, since his misuse was the proximate cause of his death, and public policy bars his recovery for his own wrongful acts. The plaintiff contests each of these assertions.

### A. Duty to the Public Regarding Dr. Deonarine

The defendants contend that they have no affirmative duty to police their product in the stream of commerce. They cite *Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464, 471 (5th Cir.1987) for the proposition that drug manufacturers, or their representatives, are not required to police rogue doctors or otherwise interfere with the physician-patient relationship.

> The problem here lies with individual physician .... The defendant cannot control individual practices of the medical community, even if it is the prevailing practice, and we decline to impose such a duty. Drug manufacturers must adequately warn physicians of the potential side effects of their prescription drugs; thereafter, the physician, with his special knowledge of the patient's needs, assumes the burden of presiding over the patient's best interest.

*Id.* at 472. The defendants assert this position is consistent with Florida law, which generally fails to "impose liability based on a defendant's failure to control the conduct of a third party." *Michael & Philip, Inc. v. Sierra,* 776 So.2d 294, 297 (Fla. 4th DCA 2000), and cases cited therein.

The plaintiffs contend that *Swayze* is inapplicable to the instant case. In that case, the manufacturer of a narcotic anesthetic provided warning to the physicians who used the product to anaesthetize patients during surgery; however, owing to a state-wide shortage of anesthesiologists the physicians commonly allowed certified registered nurse practitioners to calculate the dosage and administer the product. The court held that the manufacturer should not be required to interfere in the physician patient relationship and was not required to provide warnings to the patient. The plaintiffs assert that the instant case is very different, since the defendants knew that Dr. Deonarine was not prescrib-

ing OxyContin in the best interest of the patients, and indeed was jeopardizing the welfare of many of the patients. The plaintiffs argue that Dr. Deonarine was not the "learned intermediary" invoked by the *Swayze* court, but instead was a danger to his patients.

The plaintiffs cite a number of cases in which courts have defined special relationships which impose an affirmative duty to control dangerous activities of others; the plaintiffs urge this Court to extend the same protection to Dr. Deonarine's patients. *Hinckley v. Palm Beach County Board of County Commissioners*, 801 So.2d 193 (Fla. 4th DCA 2001)(although the county had a special relationship with developmentally disabled individuals who required public transportation, the county was not responsible for the acts of the third-party independent contract who provided transportation services); *Gross v. Family Services Agency, Inc.*, 716 So.2d 337 (Fla. 4th DCA 1998), aff'd sub nom, *Nova Southeastern Univ. v. Gross*, 758 So.2d 86 (Fla.2000)(student assigned to internship at a dangerous location could bring a claim against the university which assigned her to that location, since a special relationship existed between the student and the university). The plaintiffs assert that such a special relationship existed between the defendants and Dr. Deonaine; and that the defendants had a duty to control his activities by ceasing marketing to him and by reporting him to the authorities.

The defendants' reply contends that the plaintiffs are attempting to impose a new duty which is contrary to Florida law. In general

> [T]here is not now, nor has there ever been, any common law duty for either a private person or a governmental entity

to enforce the law for the benefit of an individual or a specific group of individuals. In addition, there is no common law duty to prevent the misconduct of third persons.

*Trianon Park Condo. Assn., Inc. v. City of Hialeah*, 468 So.2d 912, 918 (Fla.1985), citing *Restatement (Second) of Torts* § 315 (1964). "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Thompson v. Baniqued*, 741 So.2d 629, 631 (Fla. 1st DCA 1999). In particular,

> It is [the physician's] duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as of the product. The patient is expected to and, it can be presumed, does place primary reliance on that judgment.

*Buckner v. Allergan Pharmaceuticals Inc.*, 400 So.2d 820, 823 (Fla. 5th DCA 1981). This duty does not change because the "manufacturer knew or should have known that the medical profession was not warning patients of potential harmful side effects . . . ." *Id.*

The defendants also contend that Ms. Workman's review of patients' files does not provide the basis for the special relationship the plaintiffs seek to impose on the defendants. Under Florida law, only a few such "special relationships" exist, and only when one party has the right or ability to control another's conduct. *Carney v. Gambel*, 751 So.2d 653, 654 (Fla. 4th DCA 1999). Special relationships have been found to exist in employer-employee, landlord-tenant, landowner-invite and school-

minor relationships. *Gross,* 716 So.2d at 338–39. The defendants argue that since they had no legal right or ability to control Dr. Deonarine's conduct as a physician there was no special relationship between them. They did not sell or deliver Oxy-Contin to him and had no ability to do so. The plaintiff's expert, Mr. Mudri, stated that if Ms. Workman had stopped visiting the practice, it would have had no effect on Dr. Deonarine's actions.

 The undersigned is persuaded by the *Swayze* decision. In that case, the appellate court found that the overdose was the result of the unsupervised administration of the drug by certified registered nurse practitioners, which was a common practice throughout the state of Mississippi and well known to the drug manufacturers. However, the court found that knowledge of this pervasive practice was not sufficient to place a special duty on the drug manufacturer to provide warnings to patients or others. The court held that it was "the physicians who have undertaken the responsibility of supervising the CRNAs, and that responsibility cannot be shunted onto, or shared with, drug manufacturers." *Swayze,* 807 F.2d at 471. In the instant case, the Court finds that Florida law does not impose a duty on the defendants to interfere with the physician-patient relationship, even if they were aware that the product many have been prescribed inappropriately. Nor have the plaintiffs shown that a special relationship, as defined in Florida law, existed between the defendants and Dr. Deonarine. Thus

there was no duty to control Dr. Deonarine's practice of prescribing OxyContin.

 The defendants also assert that the Controlled Substances Act imposes no duty to police prescribing physicians. The defendants point out that there is no private cause of action for violation of 21 U.S.C. § 823. *McCallister v. Purdue,* 164 F.Supp.2d 783, 793 (S.D.W.Va.2001). The statute merely describes the manner in which the Attorney General should apply the "registration requirements" of an applicant to manufacture or distribute controlled substances. Nothing suggests that the legislative intent behind this statute creates a private remedy based on the doctrine of negligence per se. *Murthy v. N. Sinha Corp.,* 644 So.2d 983, 985 (Fla. 1994).

The plaintiffs' response does not provide any legal authority in opposition to the defendants' argument regarding the scope of the statute.[1] The Court finds that the statute does not place a duty on the defendants to report Dr. Deonarine to either the police or to the licensing authorities.

**B. Comparative Negligence or Sole Proximate Cause**

The defendants contend that Michael Labzda's intentional misuse of OxyContin bars recovery from the manufacturer. *Jennings v. BIC Corp.,* 181 F.3d 1250, 1256–57 (11th Cir.1999)(under Florida law safety is measured in light of the normal consumer; a lighter is not intended as a child's plaything and its misuse by chil-

---

1. They assert that Ms. Workman lied to one of Dr. Deonarine's employees who expressed a desire to report his slurred speech and drug use authorities. Ms. Kolodziejzcak testified that Ms. Workman told her that only someone with specialized knowledge, such as a doctor or pharmacist who had observed the symp-

toms, could report Dr. Deonarine to authorities. The undersigned finds that nothing in the evidence demonstrates that this was an official position of the defendants, or that Ms. Kolodziejzcak was in any way deterred by Ms. Workman's statement.

dren, while foreseeable, does not result in liability for the manufacturer). Similarly, foreseeable voluntary abuse of a non-defective product, such as alcohol, results in the legal conclusion that the proximate cause of the injury to the consumer was his voluntary abuse; the manufacturer of the substance is not liable for the injury to the user. *Bruner v. Anheuser–Busch, Inc.*, 153 F.Supp.2d 1358 (S.D.Fla.2001), affd., 31 Fed.Appx. 932, 2002 WL 187316 (2002).

The plaintiffs' response asserts that while Michael Labzda's acts might constitute negligence, they do not bar his recovery. *Goode v. Walt Disney World Co.*, 425 So.2d 1151 (Fla. 1st DCA 1982)(negligent supervision of one's child at an amusement park is foreseeable and does not shield park from liability for failing to install a proper fence to prevent access to a pool). Comparative negligence is a matter for a jury. *Rowlands v. Signal Construction Co.*, 549 So.2d 1380 (Fla.1989). Nor can the defendants claim assumption of the risk to avoid liability. *Gorday v. Faris*, 523 So.2d 1215 (Fla. 1st DCA 1988)(person who allows an inebriated person to drive his car cannot escape liability for an accident by arguing that the inebriated person assumed the risk of driving drunk—liability must be determined by comparative negligence).

The defendants' reply points out that while the plaintiffs' cases state the law for swimming pools and for drunk drivers, they do not change the law for intentional abuse of a potentially intoxicating substance such as alcohol or OxyContin. *Bruner.* Nor is this a case for comparative negligence—Florida courts consistently have upheld the doctrine of sole proximate cause, rather than comparative negligence, for the intentional misuse of a product, in spite of warnings of the danger. *Clark v. Boeing Co.*, 395 So.2d 1226, 1229 (Fla. 3d DCA 1981)(intentional misuse is the sole cause of the injury); *Watson v. Lucerne Machinery & Equipment, Inc.*, 347 So.2d 459, 461 (Fla. 2d DCA 1977)(plaintiff warned not to crawl into an industrial machine could not collect for injuries sustained while crawling in the machine).

■ The undersigned finds that the cases cited the plaintiff deal with foreseeable negligence. However, in the instant case, Michael Labzda was repeatedly warned about the dangers of misusing OxyContin and intentionally, rather than negligently, misused the product by crushing and inhaling it. As in *Bruner*, the intentional misuse of an intoxicating product is the sole proximate cause of the injury under Florida law. The cases cited in the defendants' reply demonstrate that Florida courts routinely apply the doctrine of sole proximate cause when the user intentionally misuses a product to his detriment. According, under Florida tort law, the plaintiffs's claims are barred by the Michael Labzda's intentional misuse of the product.

## IV. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Court GRANT defendants' motion for summary judgment.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable Kenneth A.

Marra, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.1988), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993).

September 8, 2003.