**UNITED STATES of America,
Plaintiff,**

v.

**Chad LIVDAHL, et al., Defendants.**

No. 05–60021–CR.

United States District Court,
S.D. Florida.

Oct. 17, 2005.

Andrew Ittleman, (D–Livdahl, Toxin, Powderz, Z–Spa, Cosmetic and Local Counsel for England).

Jane Raskin, (D–Baker and Local Counsel for Pafunda).

### ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

COHN, District Judge.

**THIS CAUSE** is before the Court upon the Report and Recommendation prepared by United States Magistrate Judge Lurana S. Snow [DE 150]. Defendants Toxin Research International, Inc., Powderz, Inc., Z–Spa, Inc., The Cosmetic Pharmacy, Inc., Chad Livdahl, and Zahra Karim filed objections [DE 364]. The Government filed a response to Defendants' objections [DE 370]. Pursuant to 28 U.S.C. § 636(b)(1), this Court conducted a *de novo* review of the entire court record and is otherwise fully advised in the premises. It is thereupon,

**ORDERED AND ADJUDGED** as follows:

(1) The Report and Recommendation [DE 150] of United States Magistrate Judge Lurana S. Snow is hereby **ADOPTED.**

(2) Defendant Chad Livdahl's Motion to Dismiss the Second Superseding Indictment [DE 284] is hereby **DENIED.**

(3) Defendant Zarah Karim's Motion to Dismiss the Second Superseding Indictment [DE 287] is hereby **DENIED.**

(4) Corporate defendants Toxin Research, Inc.'s, Powderz, Inc.'s, Z–Spa,

Inc.'s, and The Cosmetic Pharmacy, Inc.'s Motion to Dismiss the Second Superseding Indictment [DE 286] is hereby **DENIED.**

(5) Defendant Bach McComb's Motion to Dismiss the Second Superseding Indictment [DE 295] is hereby **DENIED.**

**DONE AND ORDERED.**

### REPORT AND RECOMMENDATION

SNOW, United States Magistrate Judge.

THIS CAUSE is before the Court on the defendant **Chad Livdahl's** Motion to Dismiss the Second Superseding Indictment (DE 284); defendant **Zarah Karim's** Motion to Dismiss and Strike Surplusage in the Second Superseding Indictment (DE 287), **Corporate Defendants'**[1] Motion to Dismiss the Second Superseding Indictment (DE 286) and Defendant **Bach McComb's** Motion to Dismiss Second Superseding Indictment or, in the Alternative, Motion for Statement of Particulars (DE 295), which were referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.[2] By prior Order, the undersigned denied without prejudice defendant Zahra Karim's motion, to the extent that it sought to strike surplusage in the Second Superseding Indictment, and denied without prejudice defendant Bach McComb's motion, to the extent it sought a bill of particulars.

The defendants are charged in a 48 count second superseding indictment with:

***Count 1 (All Defendants):*** **Conspiracy** to commit wire fraud and mail fraud, and

---

1. Toxin Research International ("TRI"), Powderz, Inc. ("Powderz"), Z–Spa, Inc. ("Z–Spa") and The Cosmetic Pharmacy, Inc. ("Cosmetic Pharmacy").

2. Each of the defendants who has filed a motion to dismiss has adopted the legal arguments advanced by his, her or its co-defendants. Defendant Robert Baker has not filed a motion to dismiss, nor has he adopted any such motion filed by any co-defendant.

to introduce misbranded drugs into interstate commerce, in violation of 18 U.S.C. § 371;

***Counts 2–10 (All Defendants Except Robert Baker):*** **Wire fraud,** involving an alleged scheme of the defendants to unjustly enrich themselves by marketing and selling to health care providers for use in human patients defendant TRI's Botulinum Toxin Type A that was not approved by the FDA for use in human beings as a cheap facial wrinkle treatment alternative to Allergan's Botox Cosmetic, without the administering health providers advising their human patients that TRI's product (referred to as "Mimic Botox") was not Allergan's product and was not approved by the FDA for use in human beings, in violation of 18 U.S.C. §§ 1341, 1346 and 2;

***Counts 11–44 (All Defendants Except Z–Spa and Cosmetic Pharmacy):*** **Mail fraud,** involving the same scheme alleged in Counts 2–10, in violation of 18 U.S.C. §§ 1341, 1346 and 2;

***Counts 45–46 (Defendants Livdahl, Karim, McComb, Powderz and TRI):*** **Misbranding,** that is, causing the introduction into interstate commerce TRI's Botulinum Toxin Type A, a drug which was misbranded under 21 U.S.C. § 321(g)(1) because its labels did not bear adequate directions for the use intended by the defendants, since the labels stated, "For Research Purposes Only[;] Not for Human Use," when in actuality the defendants intended, promoted and sold their product for use in humans as a facial wrinkle treatment alternative to Allergan's Botox, without adequate directions for use, in violation of 18 U.S.C. §§ 331(a) and 333(a)(2);

***Count 47 (Defendant Livdahl):*** **Perjury,** in connection with his testimony at a preliminary injunction hearing in *United States v. Livdahl, et al.,* Case No. 04–61717–CIV–COHN, in violation of 18 U.S.C. § 1623(a), and

***Count 48 (defendant McComb):*** **Mail fraud,** involving a scheme to unjustly enrich himself and to defraud his patients by advising them that he was providing them with Botox Cosmetic injections, when in fact he was injecting them with a product that had not been approved by the FDA for use in humans.

Defendant Livdahl seeks dismissal of the Second Superseding Indictment on two grounds. First, he asserts that the *mens rea* alleged was legally impossible because TRI's product was exempt from FDA regulation as a compounded drug (the product had to be reconstituted by adding distilled water). Second, he contends that his conduct was legal and was governed exclusively by Arizona state law.

Defendant Karim argues that the Second Superseding Indictment must be dismissed because it misquotes and misapplies FDA *regulations* to incorrectly allege that TRI's product was a "drug," which was subject to the FDA approval process, and because the product was exempt from the approval process as a drug used for research purposes.

The corporate defendants' first argument is that they had no duty to police the use of their product by health care providers, and that the conduct of the health care providers was the sole "proximate cause" of the fraud alleged in the Second Superseding Indictment. Second, the corporate defendants contend that health care providers have no fiduciary duty to inform their patients of FDA approval status of any prescribed drug. Therefore, it was legally impossible for the defendants to cause the health care providers to breach the alleged fiduciary duty to their patients.

Defendant McComb asserts, along with defendant Livdahl, that the Second Su-

perseding Indictment must be dismissed against him because the FDA lacks regulatory authority over "compounded" drugs and that his conduct was governed by State law. Additionally, defendant McComb argues that his conduct cannot be punished because it was protected by the Free Speech Clause of the First Amendment to the United States Constitution.

Oral argument was heard on these motions on September 14, 2005.

## RECOMMENDATIONS OF LAW

■ Challenges to the sufficiency of an indictment are premised upon the rule that a criminal conviction cannot be upheld if the indictment upon which it is based does not set forth the essential elements of the offense. *United States v. Gayle*, 967 F.2d 483, 485 (11th Cir.1992) (*en banc*), *cert. denied*, 507 U.S. 967, 113 S.Ct. 1402, 122 L.Ed.2d 775 (1993). This rule serves two functions:

> First, it puts the defendant on notice of "the nature and cause of the accusation as required by the Sixth Amendment to the Constitution. Second it fulfills the Fifth Amendment's indictment requirement, ensuring that a grand jury only return an indictment when it finds probable cause to support all the necessary elements of the crime."

*United States v. Fern*, 155 F.3d 1318, 1325 (11th Cir.1998), quoting *Gayle, supra,* at 485.

■ The general rule is that a court should not look beyond the face of the indictment to determine its sufficiency. As noted by the court in *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir.1992):

There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of the sufficiency of the evidence. Moreover, this court is constitutionally barred from ruling on a hypothetical question. The sufficiency of a criminal indictment is determined from its face.

In determining whether an indictment is subject to dismissal, the allegations contained in the indictment must be taken as true. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 33 n. 2, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

### A. Whether TRI's Product Was a "Drug" Subject to FDA Regulation

■ Defendants Livdahl, Karim and McComb contend that TRI's Botulinum Type A was not subject to FDA jurisdiction. Defendant Karim asserts that it was not properly classified as a "drug" for FDA purposes. Defendant Karim's argument focuses on the package labeling which states that the product was for research purposes only and not for human use.

■ The Food, Drug & Cosmetic Act (FDCA), is codified at 21 U.S.C. § 301, *et seq.* One definition of a "drug" includes "articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1)(C). Thus, the issue of whether an article is a "drug" for purposes of the Act turns on its intended uses. FDA regulations interpret the words "intended use" as referring to "the objective intent of the persons legally responsible for the labeling of drugs," which is "determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article." 21 C.F.R. § 202.128.[3]

---

**3.** This regulation does not specifically apply to § 321(g), but addresses other FDCA provisions dealing with intended uses of drugs.

Courts have affirmed this method of determining whether a product is a "drug" under § 321(g). In *United States v. An Article Consisting of 216 Cartoned Bottles, More or Less*, 409 F.2d 734, 739 (2nd Cir. 1969) (citations omitted), the court stated:

It is well settled that the intended use of a product may be determined from its label, accompanying labeling, promotional material, advertising and any other relevant source.... Regardless of the actual physical effect of a product, it will be deemed a drug for purposes of the Act where the labeling and promotional claims show intended uses that bring it within the drug definition.... Thus, Congress has made a judgment that a product is subject to regulation as a drug if certain promotional claims are made for it.

Promotional materials for a product which are shipped separately from the product, graphic materials distributed to prospective purchasers of the product and oral representations made to users and prospective users are equally relevant to show the intended use of the product because the FDCA is "given a liberal interpretation to effectuate its high purpose of protecting unwary consumers in vital matters of health." *United States v. Hohensee*, 243 F.2d 367, 370 (3rd Cir.1957) (*cert. denied*, 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136 (1957)), citing *Kordel v. United States*, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948). *See, also, Nature Food Centres, Inc. v. United States*, 310 F.2d 67 (1st Cir.1963) *cert. denied*, 371 U.S. 968, 83 S.Ct. 552, 9 L.Ed.2d 539 (1963) (contents of lectures and written notes on lectures evidence of intended use); *United States v. Article of Drug Designated B–Complex Cholinos Capsules*, 362 F.2d 923 (3rd Cir.1966)(radio broadcasts sponsored by product manufacturer evidence of product's intended use).

In the instant case, the Second Superseding Indictment alleges that the packaging of TRI's Botulinum Toxin Type A stated that the product was for research purposes only and not for human use, but adds that this disclaimer was "an attempt to avoid FDA detection and regulation, when, in truth and in fact, defendants intended for the product to be used on humans to treat facial wrinkles." (Second Superseding Indictment, par. 53) The Second Superseding Indictment goes on to allege that the defendants promoted the product was a cheap alternative to Allergan's Botox Cosmetic at workshops they conducted, at booths they set up at aesthetic and medical conventions, at training sessions and in e-mail and fax communications. (Second Superseding Indictment, paragraphs 54–55, 70, 72, 77–78, 82.)

These paragraphs suffice to allege that one of the "intended uses" of TRI's product was the treatment of facial wrinkles, and that this intended use brings the product within the definitions of a "drug" set forth in 21 U.S.C. § 321(g)(1)(C): an article intended to be used to affect the structure or any function of the body of man. Accordingly, defendant Karim's first asserted argument is meritless.

Defendant Karim also contends that TRI's product does not qualify as a "biological product" under the FDCA. This argument is of questionable relevance, since the issue is whether TRI's product is subject to FDA regulation as a "drug." As the Government points out, a biological product may qualify as a drug for purposes of the Act, but the offense with which the defendants are charged deals with misbranded drugs. Therefore, the issue is whether the Second Superseding Indictment sufficiently alleges that the article involved is a drug, regardless of whether it also qualifies as a biological product.

In any event, 42 U.S.C. § 262(i) defines the term "biological product" as "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product ... applicable to the prevention, treatment, or cure of a disease or condition of human beings." The defendant does not (and cannot) dispute that Botulinum Toxin Type A is a "toxin." Instead, she points out that the FDA's regulations interpreting § 262(i) refer only to products "applicable to the prevention, treatment or cure of diseases or injuries of man," and omit the statutory reference to "condition." 21 C.F.R. Part 600.3(h). Since facial wrinkles are not a disease or injury, at least according to Black's Law Dictionary's definition of these terms, the defendant asserts that TRI's toxin cannot be a biological product.

The Government notes that 21 C.F.R. Part 600.3(h) was promulgated in conjunction with the statute which preceded the current version of § 262(i), which did not include the word "condition." When the statute was amended to include this term, there was no corresponding amendment to the regulation. Nevertheless, the defendant argues that the regulation limits the application of the statute to diseases and injuries, and this court is bound by the FDA's interpretation.

The weight to be assigned to an agency's regulatory interpretation of a particular statute was squarely addressed in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Applying the Chevron analysis to the instant case, it is clear that Congress unambiguously specified that the definition of a biological product includes a toxin used in the treatment of a condition in man, as well as products used to treat diseases or injuries. Therefore, to the extent that 21 C.F.R. Part 600(3)(h) purports to eliminate the application of § 262(i) to "conditions," the regulation is invalid. Otherwise, any federal agency would be free to tamper with its statutory mandate at will.

Defendant Karim next contends that TRI's product was not a "new drug" subject to the FDA's approval process. As the Government points out in its response to defendant Karim's motion, the Second Superseding Indictment does not allege that the product was a "new drug," but that it was a misbranded drug because it failed to bear adequate instructions for its intended use: the treatment of facial wrinkles in human beings. (Second Superseding Indictment, paragraphs 44, 46, 50, 59–61, 107)

Finally, defendant Karim argues that TRI's product cannot be a misbranded drug because it is exempt from the labeling requirements of 21 U.S.C. § 352(f)(1). That statute provides that an article is misbranded unless it contains "adequate directions for use." The defendant asserts

that TRI's product is exempt from this provision pursuant to the FDA's interpretative regulation, 21 C.F.R. § 201.125 which states that drugs which ordinarily would be subject to the labeling provisions of § 352(f)(1) are exempt from those provisions if they are "shipped or sold to, or in the possession of, persons regularly and lawfully engaged ... in research not involving clinical use, or in chemical analysis, or physical testing, and it to be used only for such ... research, analysis and testing."

As discussed above, the Second Superseding Indictment alleges that the intended use of TRI's product, as demonstrated by evidence other than the product's package labeling, was the treatment of facial wrinkles in humans. The Second Superseding Indictment further alleges that the product did not include adequate instructions for this intended use. Since the allegations of the Second Superseding Indictment must be taken as true, defendant Karim's argument must fail. Accordingly, the Second Superseding Indictment alleges sufficient facts for a trier of fact to conclude that TRI's Botulinum Toxin Type A was a biological product, and defendant Karim's argument on this point must be rejected.

B. *Whether TRI's Product Was Exempt From FDA Regulation As a "Compound"*

■ Defendants Livdahl and McComb contend that the activity alleged in the Second Superseding Indictment is exempt from FDA regulation because it constitutes "compounding." The Second Superseding Indictment alleges that TRI's Botulinum Toxin Type A was a lyophilized (freeze-dried or vacuum-dried) product, which had to be reconstituted with saline solution prior to use. (Second Supersed-

ing Indictment, paragraphs 47–48). In support of their argument, defendants rely on *Thompson v. Western States Medical Center*, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002).

In that case, the Court noted that under the Food and Drug Administration Modernization Act of 1997 (FDAMA), codified at 21 U.S.C. § 353a, compounded drugs are exempted from the FDA's standard drug approval requirements, as long as the providers of those drugs abide be certain restrictions. By way of background, the Court explained:

Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient. Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product.

*Id.* at 360–61, 122 S.Ct. 1497.

Since the compounding process creates a drug, the drug which is produced is subject to the FDA approval procedures. However, until 1992, the FDA generally declined to exercise its authority over compounded drugs and left the regulation of compounding to the States. By 1992, the FDA had become concerned that some pharmacists were manufacturing and selling drugs under the guise of compounding, thereby circumventing the FDA's control of the production and sale of new drugs. Accordingly, in 1992, the FDA issued a Compliance Policy Guide which announced that the agency would exercise its discretion to initiate enforcement actions against pharmacies whose activities raised the kinds of concerns normally associated with a manufacturer. Congress turned some of these policies into law when it enacted the FDAMA. *Id.* at 362–64, 122 S.Ct. 1497.

In order to qualify for the exemption created by § 353a, a compounding pharmacist or physician could only create a compounded drug pursuant to a valid prescription that was "unsolicited" (§ 353a(a)) and the pharmacist or physician could "not advertise or promote the compounding of any particular drug, class of drug, or type of drug" (§ 353a(c)). In response to these provisions, a group of licensed pharmacies that specialize in drug compounding filed suit, challenging the restrictions as violating their rights under the Free Speech Clause of the First Amendment. *Id.* at 365, 122 S.Ct. 1497.

The trial court granted summary judgment in favor of the pharmacies, finding that the offending sections of § 353a constituted unconstitutional restrictions on commercial speech. However, the court found that these provisions were severable, and the decision did not affect the viability of the remaining portions of the statute. The Ninth Circuit affirmed the court's grant of summary judgment, but held that the offending provisions were not severable, thereby invalidating § 353a in its entirety. *Id.*

The Government appealed the Ninth Circuit's decision on the unconstitutionality of the offending provisions, but not the non-severability holding. *Id.* at 366, 122 S.Ct. 1497. The Supreme Court granted *certiorari* and affirmed the decision of the appellate court, without reaching the issue of severability. *Id.* at 377, 122 S.Ct. 1497. Based on this holding, defendant Livdahl asserts, "compounded drugs returned to their original status as entirely exempted from the [FDA's] drug approval requirements." (DE 284 at 5–6). Therefore, the defendant argues, he could not have had the requisite criminal intent to violate the misbranding provisions of the FDCA.

This argument is belied by the very case on which the defendant relies. As summa-rized above, the Supreme Court in *Western States* recognized that the FDA's decisions on whether to subject compounded drugs to the approval requirements for new drugs were *policy* determinations. Until 1992, the FDA's policy was to leave to the States the job of regulating persons and entities engaged in the process of drug compounding. After 1992, the FDA modified that policy, requiring pharmacies suspected of manufacturing drugs to submit to the new drug approval process.

In enacting 21 U.S.C. § 353a, Congress attempted to codify the FDA's modified policy, but in so doing, it ran afoul of the First Amendment. The Ninth Circuit held the entire statute to be invalid, and the Supreme Court affirmed that decision as to §§ 353a(a) and (c), without addressing the viability of the remaining provisions of the statute. Neither holding affected the FDA's ability to regulate drugs produced by the compounding process; both merely held that the particular *method* of such regulation chosen by Congress infringed on commercial speech rights protected by the Constitution. Thus, in the wake of *Western States,* the FDA issued a new Compliance Policy Guide dealing with compounded drugs, similar in many respects to the Guide issued ten years earlier in 1992. 67 Fed.Reg. 39409. This new policy is unaffected by the decision in *Western States, supra.*

Even if the argument advanced by the defendants were plausible, a more fundamental question is whether the use of saline solution to reconstitute a freeze-dried or vacuum-dried version Botulinum Toxin Type A should be viewed as the creation of a compounded drug. As discussed above, compounding traditionally involves the mixing of ingredients "tailored to the needs of an individual patient" to prepare a medication that "is not commercially available." *Western States, supra,* at 360–

61, 122 S.Ct. 1497. The reconstitution of TRI's product was required in every case, regardless of the individual patient. Moreover, the resulting medication, a liquid form of Botulinum Toxin Type A, was commercially available as Allergan's Botox Cosmetic.

The undersigned finds that the process of adding saline solution to TRI's product is analogous to dropping an Alka Seltzer tablet into a glass of water. It is unlikely that the FDA's pre–1992 policy of exempting compounded drugs from the approval policy ever was intended to apply to drugs which were "created" by a method that is tantamount to adding water.[4] For all of the foregoing reasons, the argument advanced by defendants Livdahl and McComb relating to compounded drugs must fail.

Defendants Livdahl and McComb and also argue that the compounding process is governed by the laws of their respective home states of Arizona and Florida. The Government, while not conceding that the alleged conduct of these defendants was permissible under any law, correctly points out that where any provision of state law conflicts with federal law, state law is preempted. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347–48, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

## C. Breach of Fiduciary Duty by Health Care Providers

The corporate defendants first contend that they are not legally responsible for the actions of the health care providers who purchased their product and subsequently used it for purposes other than research. They also assert that the conduct alleged in the Second Superseding Indictment does not constitute a breach of the health care providers' fiduciary duty to their patients, since there is no duty to inform a patient of the FDA regulatory status of a drug.

In support of their first argument, the defendants have made creative, if inapt, use of civil legal concepts to craft an argument that the conduct of the health care providers was the "proximate cause" of the fraud alleged in the Second Superseding Indictment. They rely principally on *Labzda v. Purdue Pharma, L.P.,* 292 F.Supp.2d 1346 (S.D.Fla.2003), which affirmed and adopted a report and recommendation authored by the undersigned. *Labzda* involved a Florida wrongful death action brought on behalf of an individual who died from an overdose of oxycontin and other drugs. The plaintiff sued the drug manufacturer, arguing that the manufacturer's sales representative knew that the doctor who had prescribed oxycontin to the plaintiff's decedent was himself a drug addict and prescribed drugs to his patients in an irresponsible and dangerous manner. Summary judgment was granted in favor of the manufacturer because (1) under Florida law, the manufacturer had no affirmative duty to police the use of its product in the stream of commerce, and (2) Florida courts consistently have upheld the doctrine of sole proximate cause, rather than comparative negligence, for the

---

**4.** As the Government points out, 21 U.S.C. § 353a(f) states that " 'compounding' does not include mixing, reconstituting or other such acts that are performed in accordance with directions contained in approved labeling provided by the product's manufacturer and other manufacturer directions consistent with that labeling." This Circuit has not addressed the issue of whether § 353a is invalid in its entirety based on the unconstitutionality of §§ 353a(a) and (c). However, even if § 353a(f) must be stricken because it cannot be severed from the unconstitutional provisions of § 353a, it supports a finding that the process of reconstituting TRI's product is not "compounding" under the customary definition of that term.

intentional misuse of a product, despite warnings of danger. *Id.* at 1356.

The defendants also cite *Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464 (5th Cir.1987), a wrongful death action brought under Mississippi law. In *Swayze,* the plaintiff's decedent died as the result of an overdose of an anesthetic administered by a nurse. The plaintiff sued the manufacturer of the anesthetic based on the theory that the manufacturer should have known that the use of anesthetics without prescription by a medical doctor was common practice in Mississippi. The court held that the drug manufacturer had no duty to intervene in the physician-patient relationship to prevent the improper use of its product.

■ These cases have no bearing the instant case for the obvious reason that they involve the interpretation of state wrongful death statutes, not criminal violations of federal statutes dealing with fraud and misbranding of drugs. The defendants ignore the fact that the Second Superseding Indictment alleges that they affirmatively advocated the use of TRI's product to treat facial wrinkles in humans, in contravention of the wording placed on the package labels and with the goal of unjustly enriching themselves. The crimes alleged in this case are fraud and misbranding for monetary gain; the defendants are not charged with inflicting physical harm on, or causing the death of, any individual. Civil tort concepts such as duty of care, comparative negligence and proximate cause are, in a word, irrelevant.

The defendants' reliance on an indictment pending in the United States District Court for the District of Oregon [5] is equally misplaced. The fact that a grand jury in Oregon charged a doctor and his nurse with using the TRI's product on human patients in contravention of the packaging warnings is of no import to the case *sub judice.* While the defendants might have preferred the grand jury in this district to charge health care providers instead of themselves, the grand jury saw fit to return the Second Superseding Indictment in this case. It is the instant indictment which is before this Court, not the one in Oregon.

■ The defendants also argue that the Second Superseding Indictment fails to allege the offenses of mail fraud and wire fraud because the health care providers owed no duty to inform their human patients that TRI's Botulinum Toxin Type A had not been approved for human use. Defendants rely on civil cases dealing with state informed consent laws and with the "off-label" use of FDA approved drugs and devices. *United States v. Evers,* 643 F.2d 1043 (5th Cir.1981) (licensed physician promoting other uses of a drug approved by the FDA for treatment heavy metal poisoning); *Hamm v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 187 F.3d 941 (8th Cir.1999) *cert. denied* 528 U.S. 1117, 120 S.Ct. 937, 145 L.Ed.2d 815 (2000) (manufacturer promoting off-label use of its products and compensating physicians for prescribing those products); *Broderick v. Danek Medical, Inc.,* 1999 WL 1062135 (S.D.Fla. Apr 09, 1999) (Case No. 95–8644–CIV–RYSKAMP) (Florida informed consent law did not require surgeon to disclose the uses for which the FDA had approved internal fixation devices).

The concept of "off-label" uses of drugs within the FDA's administrative framework is succinctly summarized in *Wash-*

---

**5.** *United States of America v. Jerome Nicholas Lentini, et al.,* CR No. 05–267 (DE 286, Exhibit 1).

*ington Legal Foundation v. Friedman,* 13 F.Supp.2d 51, 54–55 (D.C.D.C.1998):

The FDA derives its authority to regulate various aspects of the medical and pharmaceutical industries from a complex statutory and regulatory scheme, a major portion of which is embodied in the Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* In order for a prescription drug or class III medical device to be distributed by a manufacturer in interstate commerce, the manufacturer is required to demonstrate, through a rigorous series of pre-clinical and clinical trials, that the drug or medical device is both safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (b), (j). FDA makes its final approval decisions under the "substantial evidence" standard. *See* 21 U.S.C. § 355(d).

As part of the approval process, the FDA also reviews the proposed "labeling" for the drug, which includes, *inter alia,* all proposed claims about the drug's risks and benefits, as well as adequate directions for use. *See, e.g.,* 21 U.S.C. § 352(f). Labeling is a term of art that encompasses all written, printed or graphic material "(1) upon any [drug or device] on any of its containers or wrappers, or (2) accompanying such [drug or device]." 21 U.S.C. § 321(k) & (m). The most self-evident form of labeling is the package insert that accompanies the drug, but the term has also been construed to include nearly every form of drug company promotional activity, including booklets, pamphlets, mailing pieces, bulletins, and all literature that supplements, explains, or is otherwise textually related to the product. *See* 21 C.F.R. § 202.1(1)(2)(1997); *Kordel v. United States,* 335 U.S. 345, 350, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *United States v. Vitamin Indus. Inc.,* 130 F.Supp. 755, 765–66 (D.Neb.1955). The

FDA will only approve the new drug application if the labeling conforms with the uses that the FDA has approved.

.... [I]f a manufacturer wishes to market or promote a product for an unlabeled use, it must resubmit the drug for another series of clinical trials similar to those from the initial approval. Until this subsequent approval has been granted, the unapproved use is considered to be off-label. Off-label uses include treating a condition not indicated on the label, or treating the indicated condition but varying the dosing regiment or the patient population. Manufacturer promotion of off-label uses constitutes misbranding. *See* 21 U.S.C. § 351.

.... Once a drug has been approved by the FDA for marketing for *any* use, the actual prescription choices regarding those drugs are left to the discretion of the physician.... A physician may prescribe an approved drug for any medical condition, irrespective of whether FDA has determined that the drug is safe and effective with respect to that illness.

The corporate defendants argue that the use of TRI's Botulinum Toxin Type A to treat facial wrinkles in humans constitutes an off-label use of the product by health care practitioners, and further that the practitioners had no fiduciary duty to disclose to their patients that the toxin had not been approved for human use. As discussed in *Washington Legal,* however, the concept of off-label use presupposes that the product in question has been approved by the FDA for some purpose. Moreover, in the cases cited by the defendants for the proposition that a physician has no duty to specifically inform a patient of the FDA approval status of a device, the devices in question had been approved by the FDA as safe and effective for some use in humans.

The defendants have cited no case (and the undersigned could find none) which holds that a physician or other health care professional has no duty to disclose to his or her patient that a toxin he plans to inject into the patient has not been approved by the FDA for *any* use in humans. The absence of legal precedent to support this proposition may indicate that the defendants' argument has not been advanced in any case prior to this one. This would not be surprising, since such a rule would have serious implications. For example, many vaccines used to prevent dangerous diseases involve the injection of a measured quantity of the virus which causes the disease, designed to aid the human body in developing an immunity to the virus. The rule which the defendants urge upon this court would permit a doctor to obtain a virus or toxin from any source and vaccinate a patient with it, without ever informing the patient that the FDA had not approved the injection as safe for use in humans.

During oral argument on the motions to dismiss, counsel for defendant McComb suggested that the drug which the FDA has approved is Botulinum Toxin Type A, not Allergan's Botox or Botox Cosmetic. However, the Second Superseding Indictment alleges that Botox and Botox Cosmetic are drugs *derived* from Botulinum Toxin Type A, which have been approved by the FDA for use in human beings. (Second Superseding Indictment, para. 13–14.) As noted in *Washington Legal, supra*, part of the FDA approval process deals with the proposed labeling for a drug, including the promotional material. Therefore, the FDA has ensured that a physician or other health care practitioner planning to administer Allergan's Botox Cosmetic for treatment of facial wrinkles in humans will receive proper directions and precautions tailored to the specific product he or she will be using. No such protection is available for doctors who use, or patients who receive, TRI's Botulinum Type A for treatment of wrinkles or any other human condition.

This Court should not hold, as a matter of law, that a health care practitioner has no fiduciary duty to inform a patient that the drug or substance he plans to use has not been approved by the FDA for any use in humans. Moreover, it should be noted that accepting the defendants' proposition would not require dismissal of the conspiracy and fraud counts of the Second Superseding Indictment, and would have no bearing on the other charges. The fiduciary duty alleged in the pertinent counts is the duty to advise patients that the product they were receiving was not Allergan's Botox Cosmetic, in addition to the fact that the product was not FDA approved for use in humans. Therefore, the corporate defendants' arguments should be rejected.

### D. *First Amendment Claims*

Defendant McComb's primary contention is that the First Amendment protects him from prosecution for advocacy, even advocacy of lawlessness, citing *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). He argues that the Second Superseding Indictment seeks to punish him for speaking at seminars hosted by the corporate defendants.

Defendant McComb is charged with conspiracy with his co-defendants to commit wire fraud and mail fraud, and to introduce misbranded drugs into interstate commerce (Count 1); using the wires and mail to further a scheme of the defendants to unjustly enrich himself and co-defendants by marketing and selling to health care providers for use in human patients defendant TRI's Botulinum Toxin Type A that was not approved by the FDA for use in human beings as a cheap facial wrinkle

treatment alternative to Allergan's Botox Cosmetic, without the administering health providers advising their human patients that TRI's product (referred to as "Mimic Botox") was not Allergan's product and was not approved by the FDA for use in human beings (Counts 2–6, 11–14, 17, 20, 22, 24, 26–28, 31, 37, 39, 41), misbranding (Counts 45–46) and mail fraud involving List's product (Count 48). Unlike the appellant in *Brandenburg,* defendant is *not* charged mere advocacy of unlawful conduct.

 As the Government points out, the Supreme Court has squarely held that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell,* 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993). Additionally, "commercial speech enjoys First Amendment protection only if it concerns a lawful activity and is not misleading. If the speech in question passes those screens, the government may impose restrictions that advance a 'substantial' government interest and are no 'more extensive' than is necessary to advance that interest." *Whitaker v. Thompson,* 353 F.3d 947, 952–53 (D.C.Cir.2004), *cert. denied,* 543 U.S. 925, 125 S.Ct. 310, 160 L.Ed.2d 222 (2004) quoting *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

Defendant McComb is charged with participating in a criminal conspiracy and with schemes to unjustly enrich himself and others by using the wires and mails. Such offenses, by their very nature, entail proof of statements or other communications made by the accused in furtherance of the illegal agreement or scheme to defraud. The Second Superseding Indictment seeks to punish defendant McComb not for his speech, but for the underlying crime evidenced by that speech. Therefore, the Second Superseding Indictment should not be dismissed as to this defendant.

## CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED as follows:

1. Defendant **Chad Livdahl's** Motion to Dismiss the Second Superseding Indictment (DE 284) be DENIED;

2. Defendant **Zarah Karim's** Motion to Dismiss Second Superseding Indictment (DE 287) be DENIED;

3. Corporate defendants **Toxin Research's, Powder Z's, Z–Spa's and The Cosmetic Pharmacy's** Motion to Dismiss the Second Superseding Indictment (DE 286) be DENIED, and

4. Defendant **Bach McComb's** Motion to Dismiss Second Superseding Indictment (DE 295) be DENIED.

The parties will have fourteen days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable James I. Cohn, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1998), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 22nd day of September, 2005.